The Ordinary.
John Pursel, of Alexandria, died in the month of May, 1850. The executor made and exhibited an inventory of the estate on the 1st of June, 1850. On the 20th of August, 1859, he exhibited his account for final settlement to the Orphans Court of the county of Hunterdon. By order of the Orphans Court the account was restated, and the executor was charged with additional items, viz. “ advance on the sale of personal property,” “additional rent,” and “ additional interest on moneys received,” amounting to $2098.67, “Eli Pursel’s account, $839.13,” and “Jacob Pursel’s account, $300,” claimed by the executor to fiave been paid by him, were stricken from the account of his disbursements, thus increasing the balance in the hands of the executor, for which he was held liable, $3237.80. There were also added to the account of the disbursements by the executor various items for court, counsel, and surrogate’s fees. The account, thus corrected, was by the decree of the court settled and allowed. From this decree the executor has appealed, assigning, as grounds of appeal, each of the changes made in his account by the decree of the court.
The first ground of appeal is, that the court charged the executor with $164,17 advance on the sale of personal pro *517 perty. The evidence in support of this claim rests entirely upon statements furnished by the executor himself, and 'which, it is urged, should be regarded as conclusive against him.
In September, 1852, the executor made and exhibited under oath to the Orphans Court, an account of the personal estate and debts of the testator upon an application for authority to make sale of real estate for the payment of debts. In that account the executor charged himself with the vendue list $226.38,'’ and with amount “ received of individuals for grain $365.68.” The proceeds of the sale of the goods and chattels and of the grain is thus made to amount to $592.06. The amount of goods and chattels and of grain contained in the inventory and appraisement amounts only to $425.89. This shows that the executor had then received on account of grain $166H7. more than the amount at which it was appraised; and with this sum, erroneously entered at $164.17, he was charged in the account as settled by the court.
The natural inference from the face of the inventory and of the account as stated is that the charge is correct. And this inference is confirmed by the executor’s book of account, in which he has charged himself with a much larger amount for grain appraised than appears upon the face of the inventory. The court below therefore very naturally, and upon that evidence alone it would seem very properly decided that the executor should be charged with the excess received for grain above the amount specified in the inventory. Nor did the solution of the difficulty suggested at the bar of this court, to wit, that the excess had been received from the tenants of the Snyder farm, and was not included in the inventory, satisfactorily account for the discrepancy. The receipts from this source prior to the date of the account were much less than the excess, and if the receipts from the homestead farm had been included, they were much greater. It is obvious moreover, from the face of the account, that the executor was attempting to show the deficiency in the estate received, as compared with the appraisement. lie states *518 that deficit at $61.85. With this object in view, he would not have included receipts from any other source than the items comprised in the inventory without a special mention of that fact. With this view of the evidence this court, upon the argument, was satisfied that the court below were right in making the allowance. It is nevertheless an error which is susceptible of demonstration from the evidence in the cause.
Among the items contained in the inventory on file is the following: “A. Godley and others, $174.62.” No explanation is given of the nature or origin of the indebtedness. The executor, in his evidence, states that that item is “ for grain hauled to Godley’s mills before the testator died.” On turning to a rough and more specific inventory of the estate, which was never filed, and which was put in evidence not by the executor but by the exceptant, the following items appear :
Balance due from Augustus Godley, $118.44
Due from Samuel Vansyckle, 42.18
Forman Vanderbilt, flaxseed, 14.00
Amounting to $174.62
and corresponding in amount with the item contained in the inventory on file, as “A Godley and others, $174.62.”
In the executor’s book of account, among the credits of moneys received, are found the following entries :
1850. June 12, Gash from Samuel Vansyckle, ap-
praised, $42.18
“ 20, Received of Augustus Godley balance due for grain, appraised, 118.44
1851. May 30, Cash of Forman Vanderbelt, appraised, 14.00
Also the following:
1850. June 20, Gash received for oats, appraised, 8.40
“ ' Aug. 2, Cash of A. Goodley, for grain appraised, ; 169.01
1852. March 29, Gash of Charles Bartolette, for oats appraised, 13.65
Amounting to $365.68
*519 These items were all received prior to the application by the executor to sell the real estate, and they constitute the precise amount with which the executor then charged himself as “ received of individuals for grain.” It is obvious, therefore, that the supposed discrepancy does not exist, and that the charge against the executor is erroneous. The whole difficulty has grown out of the defective character of the inventory, and exhibits in a striking point of view the impropriety of suffering such inventories to be filed. They are in direct contravention of the act of 1855. Nix. Dig. 561, § 49. They do not answer the design of the law. They fail to furnish to parties interested the very information which they were designed to supply. They often lead, as in this case, to useless litigation, imperil the rights of parties, impose upon courts the painful duty of groping for the truth in the dark, or of deciding by uncertain and unreliable tests of truth. The court below were misled entirely by the defects and virtual misrepresentations of the inventory, and this court was saved from falling into the same error mainly by exhibits offered on the part of the exceptant. In this case it is true the loss of the mistake would have fallen where it justly belonged, on the head of the party guilty of the negligence that occasioned it. But it falls, it is to be feared, too often upon unsuspecting heirs and confiding relatives, who are made the victims of the carelessness or fraud which covers up the real truth under the shelter of general and unintelligible inventories. I know that these inventories are frequently exhibited under the plea of economy, the executor retaining in his possession, as in this ease, a more specific one. But that does not answer the design of the law. The parties interested are entitled to the information as well as the executor. It should be in their power, as well as in his, and should not be subject to the hazard of suppression or loss. I feel it my duty to protest earnestly against the practice, not only from the embarrassment it has occasioned in this particular case, but because I regard it as a fruitful source of litigation and as opening a wide door to *520 fraud and injustice. Justice requires that in all cases the requirements of the statute should be strictly complied with
The second exception to the decree of the Orphans Court is that the executor is charged with “ additional rent, $908.64.’' This court is unfortunately not furnished with the grounds upon which that allowance was made, nor with the mode in which the result was obtained. It would greatly have aided the investigation, if I had been assisted by the views of the Orphans Court.
The testator died on the 28th of March, 1850, seized of two farms, leaving a last will and testament executed in due form of law to pass real estate. By his will he gave to his wife one-third of all the income of his estate, both real and personal, during her lifetime, and directed that after her decease it should be equally divided among the family. The will further directs that “ she must not be disturbed in the peaceable occupation of the mansion that she now resides in during her existence." At the time of the testator’s death the homestead farm was occupied by the testator’s son Eli, the executor of the estate, under a lease for eight years, commencing on the first of April, 1849, and terminating on the first of April, 1857. By the terms of the lease he was to pay two-fifths of all the productions of the soil that he might raise from the place, annually, by way of rent. The tenant was to furnish three-fifths of the seed, to pay three-fifths of the tax, to furnish a sufficiency of lime and manure, and keep the place in good repair. The executor continued to occupy the premises under the lease till the spring of 1857. On the 26th of January, 1857, the widow died. During this period the executor has kept no account of the productions of the farm, of the amount of produce delivered to the widow, kept by himself, or sold for the benefit of the estate. He has simply made an entry of. the value in money of the several kinds of produce which he allotted to the estate on account of rent. This sum amounts, during the seven years ending on the first of January, 1857, to $1011.02. This apportionment was made, as the executor states in his evidence, *521 by giving to the widow one-third of the whole products of the farm, which was deducted from two-fiftlxs of the whole products, which latter sum the executor was to pay under his lease as rent. The effect of this division of the products of the farm was to give to the tenant three-fifths or nine-fifteenths of the entire product, to the widow one-third or five-fifteenths, and to the estate two-fifths less one-third, or one-fifteenth.
It is clear that by this apportionment the widow received more than she was entitled to by the terms of the will. Even as doweress she would not have received one-third of the gross products of the farm, but must have deducted the expense of cultivation. By the terms of the will, she was to receive one-third of all the income of the estate, real and personal. The income from land under lease can be no more than the rent or share paid by the tenant. The land was under lease from the testator to his son at the date of the will. The testator knew that his estate was to receive from that land but two-fifths of the gross products, and in giving to his widow one-third of the income of his estate he could have referred only to that portion which his estate was to receive, not to that which by the terms of the lease it was not to receive.
It is true that the income of an individual, a bank, or a government, is the amount it may receive independent of its losses, and this is all that was really decided in The People v. the Supervisors of Niagara, 4 Hill 23. But the income of a government surely does not include the cost of assessing and collecting the taxes which never reach the treasury. Uor can the income of the owner of leased lands exceed the amount of rent he receives from them irrespective of their gross annual value.
The accountant however relies not upon the will, but upon a consent of the legatees that their mother should receive one-third of the gross proceeds of the homestead farm. I think that agreement is satisfactorily proved. William Pursel states the circumstances under which the agreement was *522 made, and the inducements which led to it. A bill had been filed in this court by John and 'William, two of the sons, to set aside the will of the testator as a devise of real estate. The homestead, farm was encumbered by mortgage, and a bill of foreclosure had been filed by the mortgagee. Under these circumstances, it was deemed expedient by some of the legatees and heirs-at-law, among whom were John and William, the complainants in the bill in equity, to sell the Snyder farm and pay the debts, and thus save the homestead farm from sale while encumbered with the lease to the executor and preserve the widow’s living. The widow was to receive the one-third of the proceeds of the homestead property for her support. The question is not whether there was a valid contract founded upon legal consideration by which the legatees were bound to allow their mother one-third of the gross proceeds of the homestead farm, but simply whether that arrangement was expressly or tacitly assented to by the legatees or carried out by the executor. If it was it is clear that John Pursel, who is the sole ex-ceptant to this account, and by whose express assent the arrangement was made, can have no claim against the executor for money thus paid to his mother by his consent. The arrangement was in every respect equitable and beneficial to the interests of all concerned. In pursuance of this arrangement, the Snyder farm was sold, the mortgage satisfied, and the suit in equity abandoned. The date of this agreement is not shown. It was made during the pendency of the suit in equity against the executor, and involved its settlement. It must have been made, therefore, toward the close of the year 1852. The agreement was prospective only, and could therefore only operate from that period until the death of the widow, in January, 1857. Upon this view of the evidence, the executor must account to the estate for two-thirds of the rent of the Snyder farm till the time it was sold, April 1st, 1853, and also for two-thirds of the income of the homestead farm until the time of its sale and conveyance, on the 1st of April, 1859, excepting the period from 1853 till 1856, inclusive.-
*523 In regard to the Snyder farm, there is no difficulty in ascertaining the amount due. The executor received the rents from the first of April, 1851, to the first of April, 1853.
For the first year the rent paid was $137.86
For the second year it was 245.32
Amounting to $383.18
Deducting the widow’s third, 127.72
The balance is $255.46
for which the executor should account, lie accounted only for 129.96
Leaving due and unaccounted for $125.50
In regard to the homestead farm, the difficulty in arriving at any satisfactory result is much greater. There is no satisfactory evidence to show what the income was. The basis furnished by the executor is manifestly fallacious. He states that he credited the estate only with two-fifths, less onetliird, viz. with one-fifteenth of the products of the farm. The amount thus accounted for during seven years is $1011.02. The whole value of the products during that period must then have been $15,165.30, the average annual product $2,166.47, and two-fifths of that sum the value of the annual rent, $866.58. This included only the grain, not the grass, potatoes, or other products. The whole farm consisted of 98.20 acres, and sold for less than $4200, so that the farm, upon this hypothesis, must have paid a rent of over twenty per cent, upon its value. Again, the average annual rent accounted for by the executor to the estate during the seven years ending with 1856 was $144.43. This, the executor tolls us, was but one-fifteenth of the product of the farm, and yet in 1857, after the widow’s death and the expiration of his lease, he accounted for one half of the products, which amounted only to $328.64, and yet the half of the average annual products of the farm for the previous seven years, according to the executor’s statement, was $1083.22. Evidence which leads to such absurdity may well be discarded
*524 as incredible. I am satisfied that tbe executor has fallen into an error in regard to the apportionment made of the products and the proportion with which he credited the estate. "What that error is it is impossible to ascertain. As he has charged himself with that amount, and verified the statement by his oath, he must be bound by it, so far as relates to the period when he was acting under the agreement, but it is entirely unsafe to assume it as a basis for estimates for other years. Adopting as correct the statement made by the executor for the year 1857, one half of the products of grain alone for that year was $328.64. By the terms of the lease, the tenant was to account for two-fifths of all the products of the soil that he should raise from the place annually. He was bound not only to account for the grain, but also for hay, potatoes, and other products. Making reasonable allowance on this account, the annual product of the farm may be safely assumed to be $700. Taking this as the average for the years 1850, ’51, and ’52, the products for these three years'would be $2100, and the portion to which the estate would be entitled would be two-thirds of two-fifths, or $560. The executor has accounted for $380 of this sum, leaving the balancé of $180 to be charged on account of the rent of the homestead farm. Nothing is to be added to the income for the year 1857-8, as the lease had then terminated and the tenant accounted for a larger share of the products. The account for the year 1858-9 is only partially exhibited. The amount, as far as accounted for, is $237.16. To this is to be added the value of grain not threshed at the time of exhibiting the account, which, as ascertained by the evidence, is understood to have been included by the court below, and which is proper to be included, as there appears to be no motive or intention to exhibit any further account. The items are as follows, viz :
Buckwheat, $5.25
Wheat and rye, 130.00
Amount, $135.25
*525 This makes the balance of rent unaccounted for from the homestead farm $315.25, and the aggregate from the two farms $440.75. The executor should be charged with this additional amount only, and the account corrected accordingly.
3. The book account of the executor was properly rejected. The bulk of it was barred by the statute of limitations in the lifetime of the father, and every presumption is against the justice of any part of the claim.
The claim for $176.79, paid on the testator's note to Carpenter, was also properly rejected. The receipt states that the money was received of John Pursel by the hands of Eli. Carpenter testifies that Eli paid the money, but whose money was it ? Merely producing the receipt amounts to nothing. The receipt belonged properly to the father, and the presumption is that the executor procured it from among his father’s papers. If the money was advanced by him for his father, the note should have been assigned to him as security, or he should have taken his father’s note or other voucher for the money. In the ordinary course of business, a than does not take his own money to pay the debt of another, and suffer the transaction to stand for years without any vouchor or other evidence that the money was so advanced. The receipt is in the usual form where money is paid by an agent with the funds of the principal. The evidence of the executor is not competent to prove that he advanced the money, and that it remains unpaid. If if were so, there are circumstances and evidence in the case that tend very strongly to discredit the evidence and to render it unreliable.
The note given by the testator on the first of May, 1847, for $200 should have been allowed. Its execution was duly proved, and there was no pretence of payment. The statement, by one of the court below, that the decree upon this exception was not in accordance with his own views, nor, according to his belief, with the views of the other members of the court, and that it was intended to reject the hook *526 account only, is not competent as evidence. The fact should have been verified in another form.
4. The amount paid by the executor upon the judgment of Jacob Pursel against the estate should have been allowed. There is no dispute but that the money was paid by the executor. It is not proved or suggested that there was any fraud in the entry of the judgment. It was founded upon an account, and although the account upon its face was barred by the statute of limitations, the executor was not bound to plead the statute. Norton v. Frecker, 1 Atk. 526 ; 2 Wms. on Executors 1535. Nor is he liable for money so recovered if the demand was in other respects well founded. Hodgdon v. White, 11 New Hamp. R. 205; Kennedy's appeal, 4 Barr. 149; West v. Smith, 8 Howard 402, 412; 2 Kent’s Com. 416, note. The judgment must be regarded as at least prima facie evidence that the claim was well founded, and must be presumed to be correct until the contrary appears.
5. Neither the amount of the commissions nor the allowance of the judgment against Jonathan Pursel is made the subject of exception in the answer of the respondent. They are not therefore properly before the court. The respondent stands, in regard to the grounds of complaint not specified in his answer, in the same position as he would have done if a cross-appeal had been brought by him. {Rule 2.) If there be any error in these particulars, it is clear that it is by no means a palpable mistake, which this court might rectify of its own motion.
6. The allowance of $60 beyond the amount of legal fees to the judges, and of $200 to the counsel of each party, must be struck out of the account. The extra allowance to the court has been repeatedly held to be illegal. Under the circumstances, there is no ground for the allowance of counsel fees out of the estate to either party. Justice will be more effectually obtained by each party paying his own counsel. Much of the difficulty in this cause, and perhaps the whole controversy, has grown out of the failure of the executor to exhibit a proper inventory and to keep fair and full *527 accounts of all his transactions. His conduct in this respect has been characterized by culpable negligence, if not by intentional fraud. And he does not stand, therefore, in a situation to entitle him to the favorable consideration of the court in regard to the allowance of counsel fees. There is no ground for the allowance of counsel fees to the adverse party.
The alterations in the account will necessarily affect the question of the allowance of interest. When the account is restated counsel will be further heard, if desired, upon this exception.
All other exceptions are disallowed.